IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM MCDONALD,<br>10684 Weymouth Street<br>Unit 4<br>Bethesda, MD 20814,<br><br>       Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE<br>2201 C St. NW<br>Washington, DC 20520,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiff William McDonald brings this action under 41 U.S.C. § 4712, the National Defense Authorization Act's whistleblower protection provision, against the United States Department of State, to recover all damages and remedies provided under the law, and for his Complaint alleges:

### I.  Parties

1. Plaintiff William McDonald is a registered professional engineer with over 35 years of professional experience. He has assisted the United States Department of State (DoS) on projects across the globe, including missions in Europe, Africa, and the Middle East. In September 2016, he was retained as a personal services contractor (PSC) with DoS's Bureau of Diplomatic Security (DS). A personal services contract is "characterized by the employer-employee relationship it creates between the Government and the contractor's personnel." 48 C.F.R. § 37.104(a). An employer-employee relationship occurs when, "as a result of (i) the

contract's terms or (ii) the manner of its administration during performance, contractor personnel are subject to the relatively continuous supervision and control of a Government officer or employee." 48 C.F.R. § 37.104(c)(1).

2. Under the contract, Mr. McDonald served as a Security Program Officer for a construction project at Camp Eggers in Kabul, Afghanistan. The project was to construct a secure camp for security forces who protect the Kabul Embassy. Mr. McDonald's primary place of performance during his tenure was a DoS office located at 1801 N. Lynn Street, SA-20, Arlington, Virginia, 22209.

3. Defendant DoS is a federal executive department with its headquarters in this District, located at 2201 C Street NW, Washington, D.C. 20520.

## II.  Jurisdiction and Venue

4. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. Jurisdiction is also proper under 41 U.S.C. § 4712.

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391, as the Defendant is headquartered in this District.

## III.  Legal Background

**Enhancement of Contractor Protection from Reprisal
for Disclosure of Certain Information**

6. The National Defense Authorization Act (NDAA) for Fiscal Year 2013 implemented a Pilot Program for Enhancement of Contractor Employee Whistleblower Protections. The program enhanced contractor whistleblower protections for the employees of grantees, contractors, and subcontractors – who contract with specified executive agencies – including DoS – from reprisal for disclosing wrongdoing defined in the statute. Pub. L. No. 112-239 § 828 (codified

as amended at 41 U.S.C. § 4712). On December 14, 2016, the Program was made permanent and expanded to include personal service contracts. Pub. L. No. 114-261.

7. The Act's Senate Report makes clear that PSCs were to be afforded the protections of 41 U.S.C. § 4712, and provides an example demonstrating why such protection is necessary:

> Additionally, S. 795 would add another category of contract employees who would be protected from retaliation against whistleblowing: personal services contractors. Personal service contractors are contractors that contract their services directly with the Government, instead of as an employee of a private contracting company, but they are not currently covered under defense protections or the civilian pilot program.
>
> One notable example of the need to include personal services contractors is the story of Mr. Leonard Cooper, a mechanical engineering expert who worked as a personal services contractor on embassy security for the State Department. Mr. Cooper alleged to the Office of Special Counsel that he believes he was retaliated against after he disclosed to superiors that the Environmental Safety Protection Systems (ESPS) for embassies worldwide lack the instruments necessary to sense and account for the impact of constantly-changing wind conditions or wind that leaks into the building. This creates global vulnerability to exposure by chemical, biological, and radiological (CRB) attacks. Mr. Cooper also disclosed that the design of new stand-alone safe haven facilities, called Compound Emergency Sanctuaries (CES), in the United States Embassy Compound in Tripoli, Libya does not protect occupants against arson or fire as a weapon, leading to their guaranteed death against that type of attack. Although the United States Office of Special Counsel found a substantial likelihood that Mr. Cooper is correct and ordered a State Department investigation, his contract was not renewed. As a personal services contractor, he arguably has no recourse under current law.

S. Rep. No. 114-270, at 4-5 (2016).

8. 41 U.S.C. § 4712 protects PSCs, among others, from reprisal for engaging in certain protected whistleblowing activities. A PSC who believes that they have experienced a prohibited reprisal may submit a complaint to the relevant agency's Inspector General. The Inspector General must then investigate the complaint and report their findings to the PSC and the agency head. After

3

receiving the Inspector General's report, the head of the agency is required to determine if a sufficient basis exists for concluding that the PSC was subjected to a prohibited reprisal, and issue an order as provided in 41 U.S.C. § 4712(c).

9. The relevant statute provides, in pertinent part:

   (a) Prohibition of reprisals. –

   (1) In general. – An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

   (2) Persons and bodies covered. –

   (A) A member of Congress or a representative of a committee of Congress.

   (B) An Inspector General.

   (C) The Government Accountability Office.

   (D) A Federal employee responsible for contract or grant oversight or management at the relevant agency.

   (E) An authorized official of the Department of Justice or other law enforcement agency.

   (F) A court or grand jury.

   (G) A management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct.

   (3) Rules of construction. – For the purposes of paragraph (1) –

   (A) an employee who initiates or provides evidence of contractor, subcontractor, or grantee misconduct in any judicial or administrative proceeding relating to waste, fraud, or abuse on a Federal contract or grant shall be deemed to have made a disclosure covered by such paragraph; and

      (B) a reprisal described in paragraph (1) is prohibited even if it is undertaken at the request of an executive branch official, unless the request takes the form of a non-discretionary directive and is within the authority of the executive branch official making the request.

(b) Investigation of complaints. –

  (1) Submission of complaint. – A person who believes that the person has been subjected to a reprisal prohibited by subsection (a) may submit a complaint to the Inspector General of the executive agency involved. Unless the Inspector General determines that the complaint is frivolous, fails to allege a violation of the prohibition in subsection (a), or has previously been addressed in another Federal or State judicial or administrative proceeding initiated by the complainant, the Inspector General shall investigate the complaint and, upon completion of such investigation, submit a report of the findings of the investigation to the person, the contractor or grantee concerned, and the head of the agency.

  (2) Inspector General action. –

      (A) Determination or submission of report on findings. – Except as provided under subparagraph (B), the Inspector General shall make a determination that a complaint is frivolous, fails to allege a violation of the prohibition in subsection (a), or has previously been addressed in another Federal or State judicial or administrative proceeding initiated by the complainant or submit a report under paragraph (1) within 180 days after receiving the complaint.

      (B) Extension of time. – If the Inspector General is unable to complete an investigation in time to submit a report within the 180-day period specified in subparagraph (A) and the person submitting the complaint agrees to an extension of time, the Inspector General shall submit a report under paragraph (1) within such additional period of time, up to 180 days, as shall be agreed upon between the Inspector General and the person submitting the complaint.

  (3) Prohibition on disclosure. – The Inspector General may not respond to any inquiry or disclose any information from or about any person alleging the reprisal, except to the extent that such response or disclosure is –

      (A) made with the consent of the person alleging the reprisal;

      (B) made in accordance with the provisions of section 522a of title 5 or as required by any other applicable Federal law; or

      (C) necessary to conduct an investigation of the alleged reprisal.

(4) Time limitation. – A complaint may not be brought under this subsection more than three years after the date on which the alleged reprisal took place.

(c) Remedy and enforcement authority. –

(1) In general. – Not later than 30 days after receiving an Inspector General report pursuant to subsection (b), the head of the executive agency concerned shall determine whether there is sufficient basis to conclude that the contractor or grantee concerned has subjected the complainant to a reprisal prohibited by subsection (a) and shall either issue an order denying relief or shall take one or more of the following actions:

(A) Order the contractor or grantee to take affirmative action to abate the reprisal.

(B) Order the contractor or grantee to reinstate the person to the position that the person held before the reprisal, together with compensatory damages (including back pay), employment benefits, and other terms and conditions of employment that would apply to the person in that position if the reprisal had not been taken.

(C) Order the contractor or grantee to pay the complainant an amount equal to the aggregate amount of all costs and expenses (including attorney's fees and expert witnesses' fees) that were reasonably incurred by the complainant for, or in connection with, bringing the complaint regarding the reprisal, as determined by the head of the executive agency.

(2) Exhaustion of remedies. – If the head of an executive agency issues an order denying relief under paragraph (1) or has not issued an order within 210 days after the submission of a complaint under subsection (b), or in the case of an extension of time under paragraph (b)(2)(B), not later than 30 days after the expiration of the extension of time, and there is no showing that such delay is due to the bad faith of the complainant, the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint, and the complainant may bring a de novo action at law or equity against the contractor or grantee to seek compensatory damages and other relief available under this section in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy. Such an action shall, at the request of either party to the action, be tried by the court with a jury. An action under this paragraph may not be brought more than two years after the date on which remedies are deemed to have been exhausted.

(3) Admissibility of evidence. – An Inspector General determination and an agency head order denying relief under paragraph (2) shall be admissible

>
> in evidence in any de novo action at law or equity brought pursuant to this subsection.
>
> (4) Enforcement of orders. – Whenever a person fails to comply with an order issued under paragraph (1), the head of the executive agency concerned shall file an action for enforcement of such order in the United States district court for a district in which the reprisal was found to have occurred. In any action brought under this paragraph, the court may grant appropriate relief, including injunctive relief, compensatory and exemplary damages, and attorney fees and costs. The person upon whose behalf an order was issued may also file such an action or join in an action filed by the head of the executive agency.
>
> (5) Judicial review. – Any person adversely affected or aggrieved by an order issued under paragraph (1) may obtain review of the order's conformance with this subsection, and any regulations issued to carry out this section, in the United States court of appeals for a circuit in which the reprisal is alleged in the order to have occurred. No petition seeking such review may be filed more than 60 days after issuance of the order by the head of the executive agency. Review shall conform to chapter 7 of title 5. Filing such an appeal shall not act to stay the enforcement of the order of the head of an executive agency, unless a stay is specifically entered by the court.
>
> (6) Burden of proof. – The legal burdens of proof specified in section 1221(e) of title 5 shall be controlling for the purposes of any investigation conducted by an Inspector General, decision by the head of an executive agency, or judicial or administrative proceeding to determine whether discrimination prohibited under this section has occurred.
>
> (7) Rights and remedies not waivable. – The rights and remedies provided for in this section may not be waived by any agreement, policy, form, or condition of employment.
>
> (d) Notification of employees. – The head of each executive agency shall ensure that contractors, subcontractors, and grantees of the agency inform their employees in writing of the rights and remedies provided under this section, in the predominant native language of the workforce.
>
> (e) Construction. – Nothing in this section may be construed to authorize the discharge of, demotion of, or discrimination against an employee for a disclosure other than a disclosure protected by subsection (a) or to modify or derogate from a right or remedy otherwise available to the employee.

41 U.S.C. § 4712(a)-(e).

## IV. Allegations

### Mr. McDonald Suffered a Whistleblower Reprisal Under 41 U.S.C. § 4712

10. *Overview* – Mr. McDonald was a PSC on a DoS contract. While working on the Camp Eggers project, he identified and communicated concerns regarding the construction contractor's performance and DoS's Office of Acquisitions Management's (AQM) unwillingness to hold the contractor accountable. In retaliation for his whistleblower disclosures, DoS terminated his contract. On April 11, 2018, Mr. McDonald filed a complaint, under 41 U.S.C. § 4712, with DoS OIG. The Assistant Inspector General released the results of his investigation on November 21, 2018, finding in favor of Mr. McDonald. However, in a March 25, 2019, letter, the Procurement Executive denied Mr. McDonald the relief to which OIG found he was entitled under 41 U.S.C. § 4712.

11. At the time of Camp Eggers' closure in 2014, DS contracted with a security firm to provide security services for the Embassy and its personnel. That firm's forces were housed over two miles from the Embassy – necessitating multiple daily transports of security personnel across dangerous terrain. Given the proximity of Camp Eggers to the Embassy (0.62 miles away), DoS identified Camp Eggers as a safer location for housing Embassy security forces.

12. Extensive renovations, however, were needed before Camp Eggers could be used as a housing facility. To that end, DS modified an existing contract, Task Order 10 with Aegis Defense Services (Aegis), to perform the necessary construction work. Work began under Modification 43 of that contract.

13. Mr. McDonald is a professional engineer who has attained licensure in six states, authored several technical papers, and has made technical presentations both domestically and internationally. His commendations include a 2015 DoS Bureau

of Overseas Buildings Operations (OBO) award for "Exceptional service, innovation, and mission accomplishment in support of the Baku, Azerbaijan ISAT Emergency Security Update Project;" a 2006 Merit Achievement Award from the Raytheon Company; and a 2007 Raytheon Mission Achievement Award for work with the Department of Homeland Security. Mr. McDonald has also been a guest lecturer at Massachusetts Institute of Technology and has testified as an expert witness in Federal Court. Previously, and under a separate contract, Mr. McDonald has provided professional engineering services to various DoS missions in over twenty countries.

14. DoS renewed Mr. McDonald's 2016 personal service contract in September, 2017. Less than one month later, DoS terminated it. Mr. McDonald filed a complaint, pursuant to 41 U.S.C. § 4712, alleging that DoS terminated his contract in retaliation for his whistleblower activity. Following its investigation, the Department's OIG drafted a report concluding that Mr. McDonald was subjected to a prohibited reprisal under the statute. See Attachment 1.

**Mr. McDonald Made Whistleblower Disclosures Protected By 41 U.S.C. § 4712**

15. While working as a PSC on the Camp Eggers project, Mr. McDonald developed concerns regarding Aegis's performance and AQM's unwillingness to enforce its contract terms. Specifically, he believed that ongoing payment of Aegis's invoices was contrary to U.S. Government interests, given the contractor's lack of significant progress on the project and its failure to comply with the material terms of the construction contract.

16. When Aegis began submitting invoices for unnecessary materials, Mr. McDonald felt that he had no alternative but to voice his objections. Given AQM's

willingness to approve payment of Aegis's invoices despite minimal progress, Mr. McDonald believed that AQM was failing to properly review the contractor's claims and inappropriately permitted Aegis to engage in activity that wasted Federal funds.

17. Mr. McDonald raised additional concerns with AQM's management of the Eggers construction project, including but not limited to, the following:

    a. That AQM permitted Aegis to make "wholesale" changes to the DS/OBO specifications without authorization;

    b. That an AQM staff member encouraged Aegis to make false and misleading statements that its material purchases were in accordance with DoS project specifications;

    c. That AQM staff permitted Aegis to make "wholesale" changes to project warranties, from five years to one year, on numerous life-safety components of the project, including security doors and project generators;

    d. That Aegis failed to meet contractual obligations requiring the submission of project submittals as defined in the contract (approved submittals were only a fraction of the total project submittals – roughly less than 1%);

    e. That Aegis purchased vast amounts project equipment and materials without DoS authorization as required;

    f. That Aegis sold DoS materials that were ten years old, but presented them as though they were new;

    g. That AQM's contracting officer was repeatedly absent from key meetings with Aegis; and

   h. That Aegis' inventory was rejected as purchases were made without DoS approval.

18. These items and more prompted the Plaintiff to co-author a memo outlining his concerns, on June 28, 2017.

19. In the memo, Mr. McDonald and other personnel communicated their concerns with the project, its termination, the construction contractor, and AQM's "inadequate contract management" to DS leadership.

20. During Mr. McDonald's tenure at DS, AQM consistently accommodated Aegis, failing to enforce the contract despite the contractor's non-compliance and limited productivity. AQM declined to force Aegis to observe project milestones and participated in private meetings with the contractor – excluding other DS personnel from participating in important decisions. These developments informed Mr. McDonald's belief that AQM sided with Aegis instead of prioritizing DoS's interests.

21. The U.S. Government demobilized Camp Eggers on April 25, 2017. The project's ending did not alleviate Mr. McDonald's concerns, however, because AQM's proposed settlement methodology failed to adequately protect U.S. Government interests. Mr. McDonald objected to AQM's methodology, believing that DoS planned to pay Aegis for work that it never completed. He also believed that the DoS was terminating the contract for convenience, even though termination for default was proper given the circumstances.

22. For the duration of his contract, Mr. McDonald reported to the contracting officer's representative (COR) on the Camp Eggers project. The COR reported to the Division Chief of Worldwide Protective Services. The Division Chief reported to the Director of the Office of Overseas Protective Operations (OPO). Two

individuals held the position of OPO Director during Mr. McDonald's time working on the project.

23. On multiple occasions – before and after the project's termination – Mr. McDonald shared his concerns with members of DS management. OIG's investigation confirmed that Mr. McDonald communicated his concerns to numerous individuals within the Department, including AQM personnel, the COR, the Division Chief, and the second OPO Director.

**Mr. McDonald was Subject to Reprisal Prohibited by 41 U.S.C. § 4712**

24. Mr. McDonald performed well for the duration of his contract. In September 2017, he received a positive performance evaluation. The COR assigned Mr. McDonald "5 out of 5" on a scale of 1 (poor) to 5 (excellent), for all but two measures. On those ("Customer Satisfaction" and "Business Relations"), the COR assigned Mr. McDonald "4 out of 5." Around September 25, 2017, DoS renewed Mr. McDonald's contract.

25. The COR told the OIG that the two "4 out of 5 scores" resulted from Mr. McDonald's "interpersonal issues" with AQM. During OIG's investigation, however, the COR confirmed that he experienced no issues with Mr. McDonald, and that Mr. McDonald's performance was "generally good."

26. After July 2017, a replacement OPO Director was installed. Despite the positive performance evaluation and the renewal of his contract in September 2017, the second OPO Director terminated Mr. McDonald's personal services contract on October 20, 2017, roughly 4 weeks after its renewal. Per OIG's investigation, the second OPO Director's notes indicate that he decided to terminate Mr. McDonald's PSC on October 4, 2017. The Director's decision was subsequently

communicated to the Division Chief, who informed Mr. McDonald that his contract was being terminated on October 20, 2017.

### Department of State OIG Confirmed that Mr. McDonald Experienced Reprisal Prohibited by 41 U.S.C. § 4712

27. On April 11, 2018, Mr. McDonald submitted a complaint pursuant to 41 U.S.C. § 4712 to the Department's OIG. Therein, he alleged that DoS terminated his contract in retaliation for protected whistleblower disclosures that he made concerning the Camp Eggers project.

28. The OIG investigated Mr. McDonald's allegations, and on November 21, 2018, the Inspector General, Steve A. Linick, issued an "Action Memo" to the DoS Secretary accompanied by the OIG's findings. The report found:

> Mr. McDonald's discussion of his concerns with his management chain and personnel within AQM qualify as protected disclosures under Section 4712. Mr. McDonald's concerns related to payment of invoices for items that were not warranted or that did not fall within the statement of work; AQM's proposed methodology for settling the contractor's claims after the contract was terminated; and the termination of the contract for convenience. Mr. McDonald had a reasonable belief that these disclosures related to the gross mismanagement of a Federal contract and a gross waste of Federal funds because of the large amount spent and the relatively slight progress made. He made these disclosures to Federal employees responsible for contract oversight or management at the Department.

Attachment 1. Ultimately, OIG determined that prohibited reprisal occurred in Mr. McDonald's case because DS failed to demonstrate "by clear and convincing evidence that it would have terminated Mr. McDonald's contract absent his disclosures." *Id.* at 2 (PDF page 2).

29. 41 U.S.C. § 4712(c)(6) provides that the burdens of proof specified in 5 U.S.C. § 1221(e) control in cases brought under the new law. Thus, the complaining PSC

must establish a prima facie case that he made a protected disclosure that was a contributing factor in the personnel action taken against him. This may be demonstrated through circumstantial evidence.

30. OIG determined that Mr. McDonald satisfied his burden. The evidence demonstrated that Mr. McDonald's protected disclosures were a contributing factor in the personnel action taken against him. *See* Attachment 1 at 4-5 (PDF pages 4-5). OIG found that Mr. McDonald's management shared his concerns until OPO leadership changed hands on or around July 2017 when the second OPO director arrived. At first, the COR appreciated Mr. McDonald's concerns and wanted to avoid making unjustified payments to Aegis. However, as leadership communicated its desire to wrap up the failed project, the COR informed Mr. McDonald that he needed to "get on board" with the rest of the team. Further, an employee of Markon (the company DS retained to serve as construction consultant on the project) told OIG that he believed Mr. McDonald's contract was terminated when Mr. McDonald expressed his concerns to the second OPO Director.

31. The second OPO Director confirmed that he decided to terminate Mr. McDonald's contract after meetings in which Mr. McDonald discussed his concerns with AQM's proposed settlement methodology and management of the construction contract. He also stated that he did not know that Mr. McDonald's contract was renewed in September 2017, even though he assumed the leadership position two months previously. The OIG report states:

> Thus, although Mr. McDonald's personal services contract was renewed well after he began raising concerns, the timing of the second Director's awareness of these concerns, coupled with the timing of his decision to terminate Mr. McDonald's personal

>> services contract, provide strong circumstantial evidence that the
>> concerns were a contributing factor in the decision.

Attachment 1 at 6 (PDF page 6).

32. The OIG report notes that the second OPO Director cited performance issues as justification for Mr. McDonald's termination. In support of his reasoning, he described meetings where Mr. McDonald allegedly "acted unprofessionally" and discussed an instance where he apologized to an AQM employee for Mr. McDonald's behavior. However, AQM's Director "described Mr. McDonald's discussions with her and other AQM officials as cordial and respectful." *Id.* at 7, n.18 (PDF page 7).

33. If, after a finding that a protected disclosure was a contributing factor, "the agency demonstrates by *clear and convincing* evidence that it would have taken the same personnel action in the absence of such disclosure," corrective action may not be ordered. 5 U.S.C. § 1221(e)(2) (emphasis added). OIG's report also addressed whether DS satisfied this burden shifting provision as informed by *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). The factors to be considered under that test are:

> [T]he strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*See also* Attachment 1 at 5 (PDF Page 5).

34. OIG determined that "DS failed to present clear and convincing evidence that it would have terminated Mr. McDonald's contract in the absence of his protected disclosures." *Id.* at 6 (PDF Page 6).

35. DoS responded to the OIG report in a March 25, 2019, letter to DS Assistant Secretary Michael Evanoff, written by Senior DoS Procurement Executive Cathy J. Read.[1]

36. Despite OIG's finding of unlawful retaliation, therefore, the Office of Procurement Executive (OPE), as the Secretary's designee, denied Mr. McDonald the relief to which he was entitled under 41 U.S.C. § 4712(a).

### Subsequent Investigation Confirms Mr. McDonald's Allegations

37. Mr. McDonald's concerns regarding the Eggers project were clearly well-informed. In July 2019, the DoS OIG released a report following its review and analysis of the termination of the Camp Eggers project. The evaluation found:

> DS estimated the project would be completed by March 2016, but delays began almost immediately and persisted throughout. Although it is responsible for contract administration, the Bureau of Administration Office of Logistics Management (A/LM/AQM) failed to take meaningful corrective action against Aegis, even as it missed milestones and disregarded contract requirements.

Office of Evaluations and Special Projects, ESP-19-04, *Evaluation of the Bureau of Diplomatic Security's Aegis Construction Contract at Camp Eggers, Afghanistan* (2019). (available at https://www.stateoig.gov/system/

---

[1] Ms. Read was designated as the Secretary's designee to render a decision in the OIG finding of the Plaintiff. But Ms. Read also oversaw AQM and supervised its Division Chief, who had retaliated against another co-worker of Mr. McDonald who participated on the Camp Eggers project. In retrospect, because both the OIG and Plaintiff found that AQM mismanaged the Aegis MOD 43 contract, Ms. Read, as its organizational head, was a biased evaluator of Mr. McDonald's case, who should not have been permitted to serve as DoS's decision maker.

files/esp-19-04.pdf). The OIG lamented the lack of any substantial progress despite over $103 million spent: "[T]he compound … remained flat dirt after more than four years of effort." *Id.* at 22.

### V.     Count I: Prohibited Retaliation

38. Mr. McDonald undertook lawful acts in disclosing evidence of the gross mismanagement of a Federal contract and gross waste of Federal funds to relevant management and personnel at the U.S. Department of States' Bureau of Diplomatic Security.

39. Defendant was aware of Mr. McDonald's whistleblowing efforts described in the preceding paragraph.

40. Defendant retaliated against Mr. McDonald within the meaning of 41 U.S.C. § 4712, by terminating his contract.

41. Because of Defendant's actions, Mr. McDonald has been damaged in a substantial amount to be determined at trial.

42. Mr. McDonald is entitled to damages, attorney's fees, and expenses, for Defendant's unlawful retaliation. 41 U.S.C. § 4712(c)(2).

## VI. <u>Demand for Jury Trial</u>

43. Plaintiff, William McDonald, demands a jury trial on all issues triable under this action.

                                                    Respectfully Submitted,

                                                    /s/
                                                    Benjamin J. Vernia
                                                    D.C. Bar No. 441287
                                                    Andrew K. Murray
                                                    D.C. Bar No. 187281
                                                    THE VERNIA LAW FIRM
                                                    1455 Pennsylvania Ave., N.W., Suite 400
                                                    Washington, D.C. 20004
                                                    Tel. (202) 349-4053
                                                    Fax (866) 572-6728
                                                    bvernia@vernialaw.com

                                                  COUNSEL FOR PLAINTIFF,
                                                  William McDonald